# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

MANDY M. A. McALEES,

                          Plaintiff,

    vs.

ANDREW SAUL[1],
Commissioner of Social Security,

                        Defendant.

Case No. 3:18-cv-00304-TMB

## DECISION AND ORDER

On or about February 24, 2014, Mandy M.A. McAlees filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), alleging disability beginning August 18, 2013.[2]  Ms. McAlees has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[3]

On May 8, 2019, Ms. McAlees filed an opening brief.[4]  The Commissioner filed an Answer and a brief in opposition to Ms. McAlees's opening brief.[5]  Ms. McAlees filed a one-paged reply.[6]  Oral argument was not requested and was not necessary to the

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* section 205(g) of the Social Security Act, 42 U.S.C. 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] Administrative Record ("A.R.") 149, 606.

[3] Docket 1 (Compl.).

[4] Docket 15 (McAlees's Opening Br.).

[5] Docket 11 (Answer); Docket 16 (Def.'s Br.).

[6] Docket 17 (Reply).

Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[7]  For the reasons set forth below, Ms. McAlees's request for relief will be granted.

## I.  STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[8] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[9]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[10]  In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[11]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[12]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination

---

[7] 42 U.S.C. § 405(g).

[8] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[9] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[10] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[11] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[12] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

and "may not affirm the ALJ on a ground upon which he did not rely."[13] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, 'the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity.'"[14]

## II. DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[15] In addition, SSI may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[16] Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[17]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work

---

[13] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[14] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[15] 42 U.S.C. § 423(a).

[16] 42 U.S.C. § 1381a.

[17] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[18]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[19] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[20] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[21] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert ("VE"), *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[22] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity." *The ALJ found that Ms. McAlees had not engaged in substantial gainful activity since August 18, 2013, the alleged onset date.*[23]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical

---

[18] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[19] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[20] *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[21] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[22] *Tackett*, 180 F.3d at 1101.

[23] A.R. 609.

or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement. *The ALJ determined that Ms. McAlees's diabetes mellitus, cellulitis, lymphedema, COPD, and obesity were severe impairments. The ALJ found that Ms. McAlees's right tibial fracture and hyperlipidemia were non-severe and her fibromyalgia was not a medically determinable impairment.*[24]

**Step 3.** Determine whether the impairment or combination of impairments meets or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity. If the impairment(s) is/are the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step. *The ALJ determined that Ms. McAlees did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.*[25]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed. Once determined, the RFC is used at both step four and step five. An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not severe.[26] *The ALJ concluded that Ms. McAlees had the RFC to perform light work with limitations, including never climbing ladders, ropes, or scaffolds; avoiding all exposure to*

---

[24] *Id.*

[25] *Id.*

[26] 20 C.F.R. § 404.1520(a)(4), 416.920(a)(4).

moving and hazardous machinery and unprotected heights; avoiding concentrated exposure to fumes and dust; and avoiding moderate exposure to non-weather related extreme cold and extreme heat.[27]

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do her past relevant work, the claimant is deemed not to be disabled. Otherwise, the evaluation process moves to the fifth and final step. *The ALJ found that Ms. McAlees was capable of performing past relevant work as a tax preparer, accounting supervisor, accounts receivable clerk, and cashier. The vocational expert opined that if Ms. McAlees was limited to sedentary level work, she could perform all of her past relevant work, except for her former cashier position.[28]*

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled. *Because the ALJ found Ms. McAlees capable of past relevant work, the ALJ did not proceed to step five.*

---

[27] A.R. 610.

[28] A.R. 615.

Based on the foregoing, the ALJ concluded that Ms. McAlees was not disabled from August 18, 2013, the alleged onset date, through September 26, 2018, the date of the decision.[29]

## III. PROCEDURAL AND FACTUAL BACKGROUND

Ms. McAlees was born in 1978; she is currently 41 years old.[30]  She reported last working as a tax preparer from December 2012 to April 2013.  She also reported working as an accounting supervisor, as an accounts receivable clerk, and cashier.[31]  Ms. McAlees initiated her application for disability benefits on or about February 24, 2014.[32]  This matter has been before the ALJ twice.  The first hearing before the ALJ was held on December 16, 2014 and continued to April 27, 2015.[33]  The ALJ issued his first decision on June 23, 2015.[34]  In that opinion, the ALJ determined that Ms. McAlees could perform light work with limitations and could perform her past relevant work as a tax preparer, accounting supervisor, and accounts receivable clerk.[35]  Ms. McAlees exhausted her remedies and appealed to this Court.  On June 26, 2017, this Court found that the ALJ's decision denying disability benefits was not supported by substantial evidence and

---

[29] A.R. 615–16.

[30] A.R. 149.

[31] A.R. 177, 196, 615.

[32] A.R. 149; *supra* note 2.

[33] A.R. 33, 907.

[34] A.R. 18–26.

[35] A.R. 21, 25.

remanded the matter for further proceedings, including "obtaining the medical records from Ms. McAlees's July 2015 hospitalization and follow-up related to cellulitis as well as any records from the bariatric surgeon, Dr. Searles during the time frame at issue in this case."[36] On remand, the ALJ held two new hearings, one on March 9, 2018 and the second on July 2, 2018.[37] He issued a new decision on September 26, 2018.[38] On December 26, 2018, Ms. McAlees appealed to this Court; she is represented by counsel in this appeal.[39]

*The Medical Record*

Although the Court's review of the record is primarily focused on the time period after the alleged onset date, the Court also considers the following relevant medical evidence occurring before August 18, 2013:

On April 13, 2011, Ms. McAlees followed up with Barbara Novotny, M.D., at Providence Family Medicine Center ("PFMC") after a visit to the emergency department. She was diagnosed with cellulitis.[40]

On May 27, 2011, Ms. McAlees followed up with Casey Gokey, M.D., at PFMC. She reported losing 100 pounds in the past year and 10 pounds in the past month. She reported "going back to work this week," but that she had be "unable to work full days secondary to her pain." On physical examination, Dr. Gokey observed that redness in

---

[36] A.R. 718–44, 750–52.

[37] A.R. 624–85.

[38] A.R. 606–16.

[39] Docket 1.

[40] A.R. 1025.

her right medial thigh had resolved; "however, she continues to have quite a bit of pain" and "some weeping from her upper leg." Dr. Gokey diagnosed Ms. McAlees with diabetes mellitus, type 2; morbid obesity at 400 pounds; cellulitis with no "signs or symptoms of infection at this time"; pain "secondary to the indurated area on her right medial thigh"; and tobacco abuse. Dr. Gokey recommended gastric bypass surgery and provided a referral to Dr. Todd.[41]

On July 1, 2011, Ms. McAlees followed up with Dr. Gokey. She reported losing her job that day and was "concerned because she will not have insurance." She reported losing five pounds since May 2011 and continuing to smoke one pack per day with "no desire to quit at this time." She reported continued leg pain. Dr. Gokey observed no signs or symptoms of cellulitis infection.[42]

The following are relevant medical records occurring after Ms. McAlees's alleged onset date of August 18, 2013:

On August 18, 2013, Ms. McAlees went to the emergency department at Providence for an "infected lower left extremity." She reported being unable to afford her insulin. The attending doctor diagnosed Ms. McAlees with cellulitis, a low-grade fever, and non-compliance with diabetes. She was treated with IV antibiotics and discharged on August 19, 2013.[43]

---

[41] A.R. 1025–26.

[42] A.R. 1027–28.

[43] A.R. 267–77.

On August 26, 2013, Ms. McAlees saw Dr. Gokey for follow up after an emergency department visit for left leg cellulitis. She reported that she had been taking her antibiotics as prescribed, but she was in "much more pain" and noted that the redness was spreading and "it [felt] warmer." She was also diagnosed with uncontrolled type 2 diabetes mellitus. On physical examination, she weighed 390 pounds. Her left leg had "a large area of induration and erythema" and her right leg had a "small area of induration, but not erythema or tenderness." Dr. Gokey noted that Ms. McAlees was to report to the emergency department as she had "failed outpatient management."[44]

From August 27, 2013 to September 2, 2013, Ms. McAlees went to the emergency department at Providence. She was diagnosed with bilateral lower extremity cellulitis that failed outpatient management; diabetes mellitus, type 2, "not historically well controlled;" asthma; and tobacco abuse. Ms. McAlees reported a history of thigh lymphedema for the prior five years. She reported that it was "chronically painful if she sits or stands too long but she can generally tolerate it, until this new burning pain started about two weeks ago." She requested pursuing gastric bypass surgery. She reported having a similar episode of cellulitis two years prior. She was 390 pounds on physical examination, with intact distal pulses in the extremities, erythema and induration of the bilateral thighs, but had no obvious abscesses. The attending doctor also reported that Ms. McAlees was "afebrile, her blood pressure [was] elevated, her pulse [was] elevated to the 90s, and she [was] sat[urated] 90-96% on room air." She also developed a drug reaction with extensive

---

[44] A.R. 1043–45.

hives, "was changed to high-dose clindamycin," and received a consultation for infectious disease during her inpatient stay.[45]

On August 29, 2013, Katheryn Ryan, D.O., and Kimberly B. Thornas, M.D., completed a health status report form for the State of Alaska, Department of Health and Social Services. Drs. Ryan and Thornas diagnosed Ms. McAlees with cellulitis, type 2 diabetes; morbid obesity; asthma; and lymphedema. The doctors opined that Ms. McAlees could not work full-time or part-time for three months.[46]

On September 23, 2013, Ms. McAlees followed up with Dr. Gokey. She reported that her cellulitis was "almost resolved"; however, she still had "quite a bit of induration." She also reported continued pain in her left extremity. Dr. Gokey diagnosed Ms. McAlees with chronic lymphedema. She noted that Ms. McAlees was "given a handwritten prescription for [the] lymphedema clinic," but that the referral was not effective. Her weight was 398 pounds at the visit with a "large area of induration on [the] [left] medial thigh" and that her erythema had resolved. Dr. Gokey's diagnoses included uncontrolled type 2 diabetes mellitus; morbid obesity; left leg cellulitis, resolved; lymphedema; and mild, persistent asthma. Dr. Gokey prescribed 60 tablets of hydrocodone/acetaminophen (Lortab) for pain.[47]

On October 31, 2013, Ms. McAlees saw Dr. Gokey. She reported losing weight. Ms. McAlees weighed 389 pounds at the visit. Dr. Gokey noted that she had referred Ms.

---

[45] A.R. 278–349, 376–84, 1045–46.

[46] A.R. 352–53.

[47] A.R. 1045–48.

McAlees to bariatric surgery. Dr. Gokey noted that Ms. McAlees left leg cellulitis had resolved, but that she continued to have leg pain. Dr. Gokey also noted that Ms. McAlees's diabetes remained uncontrolled. She provided a referral to Ms. McAlees for physical therapy at the lymphedema clinic. Dr. Gokey refilled Ms. McAlees's prescriptions for tramadol and Lortab. Dr. Gokey also completed a 6-month handicapped parking permit.[48] On the same date, Dr. Gokey completed a Health Status Report Form for the State of Alaska, Department of Health and Social Services. Dr. Gokey diagnosed Ms. McAlees with cellulitis; type 2 diabetes; morbid obesity; asthma; and lymphedema. She opined that Ms. McAlees was unable to work part-time or full-time for the next 12 months. She recommended bariatric surgery and a weight loss program.[49]

On January 15, 2014, Ms. McAlees followed up with Dr. Gokey. She reported losing weight, but that she continued to have pain bilaterally in her inner thighs. She also reported she was "on Medicaid now and can finally afford her medications." On physical examination, Dr. Gokey observed that Ms. McAlees weighed 384 pounds with significant lymphedema in her lower extremities, but her left leg cellulitis had resolved. Dr. Gokey noted that Ms. McAlees continued to have uncontrolled type 2 diabetes mellitus; insomnia; morbid obesity; and left thumb pain and weakness with reported dislocation.[50]

On March 20, 2014, Ms. McAlees visited Dr. Gokey. She reported that she had stopped smoking. Ms. McAlees reported walking every day "to stay as mobile as

---

[48] A.R. 1049–50.

[49] A.R. 350–51.

[50] A.R. 1053–54.

possible," but had "a very difficult time walking" and considered herself "almost immobile" due to her weight. She reported "significant leg pain which [had] persisted since her most recent episode of cellulitis." She also reported "planning on an [appointment] next month" with Dr. Searles for bariatric surgery. Dr. Gokey observed no new lesions or redness in the bilateral inner thighs; a weight of 388 pounds; and "significant lymphedema" in the lower extremities with no signs of infection.[51]

On April 15, 2014, Nathaniel Arcega, M.D., a state reviewing physician, opined that Ms. McAlees could lift and carry up to 20 pounds occasionally; 10 pounds frequently; stand and walk up to two hours total and sit up to six hours total in an eight-hour workday. Dr. Arcega opined that Ms. McAlees could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl occasionally, and never climb ladders, ropes, or scaffolds.[52]

On May 21, 2014, Ms. McAlees saw Dr. Gokey for a bariatric surgery preoperative workup. She reported continued weight loss, eating healthier, walking every day, but also reported being limited by significant leg pain after cellulitis. She reported that Lortab enabled her to continue "doing her ADLs." Ms. McAlees expressed a "[d]esire to qualify for disability" and had "apparently been denied by the state of [Alaska]."[53]

On June 10, 2014, Ms. McAlees initiated physical therapy with Chugach Physical Therapy.[54]

_____

[51] A.R. 1055–56.

[52] A.R. 73–77.

[53] A.R. 1059–60.

[54] A.R. 403–04. Ms. McAlees regularly participated in physical therapy sessions from approximately June 12, 2014 through October 13, 2014. A.R. 389–401, 456, 563–78.

On June 16, 2014, Ms. McAlees followed up with Dr. Gokey as part of her bariatric surgery preoperative workup.  She reported walking every day, but she was limited by pain.  Dr. Gokey noted that Ms. McAlees was referred to Chugach Physical Therapy for lymphedema (and that she had been referred to Providence Physical Therapy in September 2013 and May 2014).  Dr. Gokey diagnosed Ms. McAlees with chronic lymphedema of the lower extremity, "resulting [in] multiple episodes of cellulitis and prolonged hospitalization[s] requiring IV antibiotics."  She noted that Ms. McAlees was "at HIGH RISK of repeated episodes of cellulitis due to her chronic lymphedema, and with this, repeat prolonged hospitalizations."  Dr. Gokey noted that Ms. McAlees "should NOT maintain her lower extremities (both of [Ms. McAlees's] lower extremities have significant lymphedema) in a gravity-dependent position for long periods of time; this includes prolonged standing, sitting, or crossing legs.  When she is not actively exercising, she should be laying down with her legs elevated above her heart."  Dr. Gokey also opined that Ms. McAlees "should continue her exercise and weight training" and should "wear a properly fitted compression garment worn during exercise.  Unfortunately, for [Ms. McAlees], her morbid obesity will limit the effectiveness of compression pumps or sleeves."  Dr. Gokey noted that Ms. McAlees had "lost a very small amount of weight" and "that at this point with the extent of her morbid obesity, the sooner she can undergo gastric bypass surgery the sooner we can potentially be on a road to significant weight loss, and hopefully, significant improvement of her lower extremity lymphedema."[55]  On the same date, Dr. Gokey completed a Health Status Report Form for the State of Alaska,

---

[55] A.R. 1061–65.

Department of Health and Social Services. Dr. Gokey diagnosed Ms. McAlees with morbid obesity, chronic lower extremity lymphedema, insulin dependent type 2 diabetes mellitus, asthma, and recurrent lower extremity cellulitis requiring hospitalization. She opined that Ms. McAlees could not work full-time or part-time and her conditions limited her ability to work for more than the next 12 months. She noted that Ms. McAlees required "bedrest with legs elevated."[56]

On July 14, 2014, Ms. McAlees saw Marlena Purchiaroni, D.O., at PFMC, for her bariatric surgery workup. She reported seeing a physical therapist for lymphedema twice a week. Ms. McAlees also reported that she "tried to do some compression work; however, this is difficult due to the size of her legs." She reported performing home exercises for self-lymphatic drainage daily and "wearing her compression sleeves daily." Ms. McAlees reported walking every day, but that she was limited by pain. She reported running out of her prescription of 90 tablets of Lortab after three weeks.[57]

On October 15, 2014, Ms. McAlees participated in physical therapy at Chugach Physical Therapy. The therapist noted that Ms. McAlees was using a cane.[58]

On November 12, 2014, Ms. McAlees followed up with Dr. Purchiaroni. She reported continuing to "perform daily self-lymphatic drainage and wear her compression sleeves." She reported walking daily, but that her "legs cause[d] her significant pain and

---

[56] A.R. 1224–25.

[57] A.R. 1065–66. Ms. McAlees saw Dr. Purchiaroni for follow up examinations on August 15, 2014, September 15, 2014, October 3, 2014, October 16, 2014, and November 4, 2014. A.R. 415–22, 1071–89.

[58] A.R. 562. Ms. McAlees participated in regular physical therapy sessions from October 20, 2014 through February 23, 2015. A.R. 509–517, 520–531, 536–552, 555–558, 561.

walking [was] very difficult as a result." Dr. Purchiaroni also noted that Ms. McAlees should remain "bedridden as often as possible to alleviate both her pain and lymphedema." On physical examination, Dr. Purchiaroni observed "[p]rofound lymphedema in [the] bilateral [lower extremities]," but no cyanosis or clubbing. Dr. Purchiaroni noted that the visit was Ms. McAlees's last "supervised weight loss and exercise program with a licensed medical professional."[59]

On April 1, 2015, Ms. McAlees followed up with Dr. Purchiaroni. On physical examination, Dr. Purchiaroni observed that Ms. McAlees walked with a cane. She observed that Ms. McAlees's lower extremities had massive edema "with indurated lobes, thread pulses bilaterally." She noted that Ms. McAlees's diabetes was "[p]oorly controlled."[60] On the same date, Dr. Purchiaroni completed a Physical Capacities Evaluation. She diagnosed Ms. McAlees with severe hereditary lymphedema, HTN, DMT2, hypertriglyceridemia, asthma, and morbid obesity. She noted that Ms. McAlees's lymphedema, HTN, DMT2, and asthma were expected to last at least 12 months. Dr. Purchiaroni opined that Ms. McAlees was on bedrest "whenever not exercising." She recommended water therapy and daily self-lymphatic treatment. Dr. Purchiaroni also noted that Ms. McAlees was unable to drive when taking Norco. She opined that Ms. McAlees's "lymphedema is a chronic condition which will likely be present for the rest of her life with little improvement." She also opined that Ms. McAlees could sit for 30 minutes continuously for a total of two hours; stand for three minutes continuously for a total of 15

---

[59] A.R. 1090–94.

[60] A.R. 998–999.

minutes; and walk 500 feet continuously for a total of 15 minutes in an eight-hour workday. Dr. Purchiaroni opined that Ms. McAlees could lift up to 25 pounds occasionally; carry up to 20 pounds occasionally; and bend and reach occasionally, but never squat or climb or push or pull. She opined that Ms. McAlees was not able to travel by bus.[61]

On May 27, 2015, Ms. McAlees saw Briana Cranmer, M.D., at PFMC, for lymphedema and chronic pain.[62] On the same date, Dr. Cranmer completed a State of Alaska Health Status Report. She opined that Ms. McAlees could not work full or part-time for more than the next 12 months and that she needed to be on bedrest with her legs elevated.[63]

From July 12, 2015 to July 13, 2015, Ms. McAlees was hospitalized at Providence for cellulitis.[64]

On July 21, 2015, Ms. McAlees visited Dr. Purchiaroni for follow up after hospitalization for lower extremity cellulitis. She reported a "significant amount of pain and redness of both legs." On physical examination, Dr. Purchiaroni observed "[s]evere [lower extremity] lymphedema with massive lobing of legs, the underside of both lobes [was] erythematous, warm, and very tender to palpation, [right greater than left]. There [was] also erythema and warmth on the lateral aspect of her [right] calf. There [did] not

---

[61] A.R. 580–85.

[62] A.R. 993–96.

[63] A.R. 1222–23.

[64] A.R. 590–601.

appear to be an active nidus for infection or any impressive skin breaks with signs of oozing or weeping. Thready dorsalis pedis pulses."[65]

On July 23, 2015, Dr. Purchiaroni provided a letter for Ms. McAlees. She requested that Ms. McAlees "be granted disability status as there are no reasonable professions or trades that would allow for her employment, given her severe hereditary lymphedema and resultant high risk of cellulitis." Dr. Purchiaroni also noted that Ms. McAlees's "lymphedema is so severe that she is disabled, requiring a cane to walk" and that Ms. McAlees walked "only out of necessity, as at all other times, her legs should remain elevated, in a non-gravity-dependent position." She also noted that even with precautions, Ms. McAlees is "prone to cellulitis which can very quickly cause life-threatening sepsis." Dr. Purchiaroni also noted that Ms. McAlees had required hospitalization for cellulitis "numerous times in the past, the most recent of which was earlier this month."[66]

On August 27, 2015, Ms. McAlees saw Dr. Purchiaroni. She reported being concerned "with her legs." She reported being in "excruciating pain" and believed her cellulitis was "flaring." Dr. Purcharioni observed "[s]evere, woody edema throughout [the] entirety of [the] legs" with lobed 2/2 severe edema. Dr. Purcharioni also noted that the right thigh lobe "was erythematous and warm with three 1cm abscesses scattered over

---

[65] A.R. 1125–26.

[66] A.R. 588.

the knee area, the worst of which [was] located at the flexor surface of the knee" that was "draining purulent matter."[67]

On September 3, 2015, Ms. McAlees had gastric bypass surgery.[68]

On November 30, 2015, Ms. McAlees returned to physical therapy at Chugach Physical Therapy. The therapist noted that Ms. McAlees walked with a "wide base due to pannus/swelling pockets [in the] inner knee region" and that the "[p]ockets collide[d] and disrupt[ed] [her] overall gait mechanics." The therapist also noted that Ms. McAlees continued to present with "consistent [l]ymphedema [in the lower extremities] accompanied by weakness in the [lower extremities] and core/trunk, as well as restricted [range of motion] in [the] knees."[69]

On January 13, 2016, Ms. McAlees followed up with Dr. Purchiaroni. She reported "[g]eneralized body pain and severe lower extremity pain." She reported that the pain "makes it extremely hard for her to function regularly." Dr. Purchiaroni included a new diagnosis of fibromyalgia, but noted, "this is a diagnosis of exclusion, it is hard to say at this point whether or not she has this diagnosis. However, she does have generalized body pain with greater than 11/18 soft tissue tender points on her exam."[70]

---

[67] A.R. 1128–29.

[68] A.R. 986–87. On September 16, 2015, Ms. McAlees followed up with Dr. Searles after surgery. A.R. 970. On September 29, 2015, Ms. McAlees followed up with Marya Spurling, M.D., at PFMC. A.R. 1130–31. She followed up with Dr. Searles on March 9, 2016. He noted that she was able to "easily get[ ] to the exam table." A.R. 968.

[69] A.R. 1201–02.

[70] A.R. 1132–33.

On April 11, 2016, Ms. McAlees saw Dr. Purchiaroni.  She requested a referral for plastic surgery to remove her excess skin secondary to her rapid weight loss after bariatric surgery.  Dr. Purchiaroni noted that Ms. McAlees's lymphedema and lipoedema had "significantly improved" after bariatric surgery.  Dr. Purchiaroni also observed that Ms. McAlees "still [had] large lobes at the medial aspect of both knees and smaller lobes at her ankles."  She referred Ms. McAlees to a lymphedema specialist "given her complicated lymphedema picture at this juncture."[71]  On the same date, Dr. Purchiaroni completed a Health Status Report Form for the State of Alaska, Department of Health and Social Services.  She continued to recommend bed rest and leg elevation and opined that Ms. McAlees was not capable of part-time or full-time work.[72]

On September 14, 2016, Ms. McAlees followed up with Dr. Searles.  She reported rashes and infections under the pannus and thighs and that redundant soft tissue rubbed, making walking difficult.  Ms. McAlees was 231 pounds at the visit, down 165 pounds since surgery.  Dr. Searles noted that he would refer her to plastic surgery "[g]iven her redundant skin and complications."[73]

On March 27, 2017, Ms. McAlees saw Evan Jones, M.D., at PFMC, for a "referral for surgical evaluation for reduction of redundant skin folds following bariatric surgery and

---

[71] A.R. 1137–38.

[72] A.R. 1220–21.

[73] A.R. 967.

subsequent weight loss." Dr. Jones observed "substantial swelling of the thighs bilaterally" and "some pain elicited with passive [range of motion] of the right knee."[74]

On June 16, 2017, Ms. McAlees followed up with Dr. Jones. Dr. Jones noted that "the patient was unable to see a physician for consultation for removal of redundant skin folds following significant weight loss after her bariatric surgery. Due to Medicaid status it seems that there are very few plastic surgeons [who] would be willing to operate on this patient." Dr. Jones also noted that Ms. McAlees had been hospitalized three times for cellulitis of her thighs, but she had only been hospitalized once since her gastric bypass surgery.[75]

On August 3, 2017, Ms. McAlees re-initiated physical therapy at Chugach Physical Therapy. She reported that she had continued right knee pain, lymphedema, and neck pain. She also reported "continued issues with cellulitis, excess skin, swelling and bulbous areas around her knees." Ms. McAlees reported that she had compression garments for her lymphedema, but she did not "have them on at the time of the initial evaluation." The therapist observed that Ms. McAlees ambulated with an antalgic gait pattern with "increased bulbous areas in both knees which cause her to circumduct her legs when walking to clear the excess tissue." Due to time constraints the therapist did not assess Ms. McAlees's lymphedema, but noted that "[s]he would benefit from [a] skilled

---

[74] A.R. 1144–46.

[75] A.R. 1148–49.

PT to address her knee pain, lymphedema, cervical issues, decrease her pain and improve her pain free functional mobility."[76]

On February 8, 2018, Dr. Jones completed a Health Status Report Form for the State of Alaska, Department of Health and Social Services. He opined that Ms. McAlees was unable to work full-time and her ability to work was limited for more than 12 months. He noted that Ms. McAlees continued to require bed rest and leg elevation.[77]

*Hearing Testimony on March 9, 2018*

On March 9, 2018, Ms. McAlees testified with a representative at a hearing before ALJ Hebda on remand from the U.S. District Court in the District of Alaska. She testified that she had lymphedema in both legs, but it was most severe in her right leg. She also testified that she had asthma; obesity; fibromyalgia; and osteoarthritis in both knees, recently diagnosed. Ms. McAlees testified that she had pain in her thighs that went "straight down" to her ankles and swelling in her ankles "every day." She noted that depending on the severity of the swelling in her legs, some days she could walk well. She testified that a good day would be "limited amounts of swelling and pain" and on a bad day she could not get out of bed. She indicated that sitting more than an hour or two caused her legs to "start to go numb and swell." She also testified that she had tried compression stockings but her thighs were too big due to lymphedema, and Medicaid did not cover "designer made stockings." Ms. McAlees testified that she used a cane daily. She also testified that her doctor required her to "elevate [her legs] the majority of [her]

---

[76] A.R. 1203–04.

[77] A.R. 1217–18.

day to keep the swelling down." She stated, "[th]e more I elevate my legs, the least amount of pain and the least amount of swelling I have" and noted that she spent about 15 to 18 hours each day elevating her legs.[78]

Robert Sklaroff, M.D., testified as the medical expert. Based on his review of the record, Dr. Sklaroff opined that Ms. McAlees could lift 50 pounds occasionally and 25 pounds frequently; sit, stand, or walk up to six hours each in an eight-hour workday; could push, pull, squat, bend, and reach "with some concentration and postural manipulation"; could not climb ropes, ladders, or scaffolds and should avoid hazardous machinery, but if she continued "to smoke a pack-a-day, as seems to be the case, then no environmental limitations." Upon questioning by Ms. McAlees's attorney, Dr. Sklaroff agreed that Ms. McAlees should have limitations to dust and extreme temperatures if she stopped smoking. Dr. Sklaroff testified that there was "no definable problem with [Ms. McAlees's] bones, her muscles and her nerves" and opined that Ms. McAlees did not need an assistive device. He also stated that "one would argue that the physical movement would facilitate efforts to lose weight." He testified that "elevating the legs in order to get rid of edema is dwarfed by the use of either T.E.D. stockings, or in this situation . . . JOBST stockings which have been around for a half-a-century." He further testified that "the [notion] that leg elevation would favorably affect this patient is not supported by the medical data and it is not supported in the medical literature." Dr. Sklaroff opined that there was "no mandate that [her legs] be elevated" and that Ms. McAlees "should have thigh-high compression stockings." He noted that Ms. McAlees's cellulitis was persistent,

---

[78] A.R. 654–59.

but he disagreed that it would meet or equal a listing "because every time I see a progress note I see a healing." Dr. Sklaroff disagreed with Ms. McAlees's treating doctors that her lymphedema was "a chronic condition which will likely be present for the rest of her life with little improvement," stating, "I disagree because if she lost the 200 pounds it would abate automatically."[79]

*Hearing Testimony on July 2, 2018*

On July 2, 2018, Ms. McAlees testified at a continued hearing before ALJ Hebda with representation. The previous hearing was continued to allow Ms. McAlees to obtain information regarding her fibromyalgia claims, but her attorney confirmed that there was only one diagnosis of exclusion and that Ms. McAlees "doesn't have it." Ms. McAlees testified that she had leg pain "all day long, every day" and that she had had lymphedema since 2007. She testified that she had had cellulitis since 2011 and that she had been hospitalized for cellulitis three times. She testified that she continued to have episodes of cellulitis at least once a month. She also testified that she needed skin removal surgery "because it is causing issues with my cellulitis anywhere there's overlapping of skin." She also testified that she spent the majority of her day with her legs elevated because it kept "the pressure down" and helped with pain. She testified that she could not work because she "kept getting infections" and "wasn't able to keep the infections at bay because [her] skin [was] compromised where [she had] the fluid in [her] legs." Ms. McAlees indicated that she had been doing physical therapy on a regular basis since 2011 and that it helped but it didn't solve her lymphedema problems. She noted that a physical therapist

---

[79] A.R. 629–53.

specializing in lymphedema tried to fit her for compression socks above the knee and Medicaid would not pay for them. She testified that she had tried "alternative options such as Ace bandages and even so far as to use duct tape." She also testified that she could not work "with the amount of time I'm allowed to be mobile." Ms. McAlees also testified that she had not had skin removal surgery because "I haven't found a surgeon here in Alaska willing to touch me." She testified that she needed to walk with assistance.[80]

Daniel Labrosse testified at the hearing as the vocational expert. He testified that, based on the ALJ's hypothetical, Ms. McAlees could perform her past work as a tax preparer, an accounts supervisor, an accounts receivable clerk, and a cashier.[81] VE Labrosse also opined that a change in the hypothetical from medium to light work would still allow Ms. McAlees to perform all of her relevant past work. He opined that she would not be able to perform work as a cashier if the hypothetical was limited to sedentary work. Upon questioning by Ms. McAlees's attorney, VE LaBrosse testified that a person required to keep her legs up for most of the day was not employable.[82]

---

[80] A.R. 664–79.

[81] The ALJ's first hypothetical was as follows:

> I have an individual with the claimant's age, education and past work experience who would be able to perform medium level work as defined by the Social Security Administration, but would not be able to climb ladders, ropes and scaffolding; would have to avoid all exposure to moving and hazardous machinery as well as unprotected heights; would have to avoid concentrated exposure to fumes and dust; and avoid moderate exposure to non-weather-related extreme cold and non-weather-related extreme heat. A.R. 680–81.

[82] A.R. 680–83. At the hearing, Ms. McAlees's attorney asked the question, "if a person is required to keep her legs up in a laying down position for most of the day, is she going to be employable?" VE LaBrosse answered, "No." A.R. 683.

*Function Report*

Ms. McAlees completed a function report on March 8, 2014. She reported that standing, walking, or sitting with her "legs down causes severe pain and swelling in the legs, making it hard to walk." She also indicated that lymphedema caused her thighs to be "the size of bowling balls." She reported that she kept her legs elevated during the day. She also reported that her 12-year old daughter and family helped care for her pets, fix meals, keep the house, and do the shopping, but that she could prepare her own meals, do laundry, wash dishes, and perform other household chores in a sitting position. Ms. McAlees reported that she did not do yard work or snow removal. She indicated that she could drive a car and go out alone, pay bills and handle finances, and read. Ms. McAlees reported that she needed help with her socks and had to sit to bathe and wash her hair, but she could take care of her own personal care. She reported that she was "unable to lift [and] carry anything heavy because it throws my balance off, walking is hard due to my tumors, sitting cuts off circulation below the knee [and] makes my legs hurt." She indicated that she could walk 50 feet before needing to rest. She reported that she used a cane, walker, and brace/splint. She reported taking hydroxyzine, lisinopril, tramadol, Vicodin, and metformin.[83]

## IV. DISCUSSION

Ms. McAlees is represented by counsel in this appeal. In her opening brief, she asserts that the ALJ: (1) erred by rejecting Ms. McAlees's treating physicians' opinions with no weight as they were "unanimous that Ms. McAlees must elevate her legs, and

---

[83] A.R. 187–95.

their opinions are consistent with the record" and (2) the RFC was not supported by substantial evidence because Ms. McAlees "must keep her legs elevated above her heart except when necessary to walk because the leg elevation is due to hereditary lymphedema and resultant high risk of cellulitis even after weight loss surgery." She also asserts that the RFC "fails to account for the excess skin due to weigh loss from nearly 400 lbs. to about 230 lbs."[84] The Commissioner contests each of the above assertions.[85] As set forth below, in addressing Ms. McAlees's first claim, the Court concludes that the ALJ erred by failing to provide specific and legitimate reasons supported by substantial evidence for rejecting the unanimous opinions of Ms. McAlees's treating physicians. The Court reverses the ALJ's decision based on that error and does not reach Ms. McAlees's remaining claims.

A. Medical Opinions

Ms. McAlees asserts that the ALJ erred by assigning no weight to the unanimous medical opinions of Ms. McAlees's treating physicians that Ms. McAlees "must keep her legs elevated except when she needs to ambulate." She alleges that the opinions are "medical source diagnostic opinion[s], not a transgression of the commissioner's prerogative."[86]

1. *Legal Standard*

"Regardless of its source, [the SSA] will evaluate every medical opinion [it]

---

[84] Docket 15 at 1, 4–13.

[85] Docket 16 at 4–9.

[86] Docket 15 at 4–5.

receive[s].”[87]  Medical opinions come from three types of sources: those who treat the claimant; those who examine but do not treat the claimant; and those who neither examine nor treat the claimant.[88]  “As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.”[89] In the Ninth Circuit, “[t]o reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence.”[90]  When “a treating or examining doctor’s opinion is contradicted by another doctor’s opinion, an ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence.”[91]  This can be done by “setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.”[92]

Factors relevant to evaluating any medical opinion include: (1) the examining or treating relationship; (2) the consistency of the medical opinion with the record as a whole; (3) the physician’s area of specialization; (4) the supportability of the physician’s opinion

---

[87] 20 C.F.R. §§ 404.1527(c), 416.927(c).  These sections apply to claims filed before March 27, 2017.

[88] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

[89] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[90] *Trevizo v. Berryhill,* 871 F.3d 664, 675 (9th Cir. 2017) (quoting *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005)).

[91] *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017).

[92] *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

through relevant evidence; and (5) other relevant factors, such as the physician's degree of familiarity with the SSA's disability process and with other information in the record.[93] An ALJ may reject the opinion of a doctor "if that opinion is brief, conclusory, and inadequately supported by clinical findings."[94]

The opinions of agency physician consultants may be considered medical opinions, and their findings and evidence are treated similarly to the medical opinion of any other source.[95] "The weight afforded a non-examining physician's testimony depends 'on the degree to which he provides supporting explanations for his opinions.'"[96] Greater weight may also be given to the opinion of a non-examining expert who testifies at a hearing because he is subject to cross examination.[97] The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.[98]

### 2. Analysis

In this case, multiple treating and examining physicians provided the same opinion that Ms. McAlees could not work and needed bedrest and leg elevation.[99] Specifically, in

---

[93] 20 C.F.R. §§ 404.1513a(b), 416.913a(b), 404.1527(c)(2), 416.927(c)(2). These sections apply to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.614.

[94] *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005).

[95] 20 C.F.R. §§ 404.1513a(b), 416.913a(b).

[96] *Garrison,* 759 F.3d at 1012.

[97] Andrews v. Shalala, 53 F.3d 1035, 1042 (citing Torres v. Secretary of H.H.S., 870 F.2d 742, 744 (1st Cir. 1989)).

[98] *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002).

[99] The determination whether Ms. McAlees is disabled and whether there is a job in the national

August 2013, Dr. Ryan provided an opinion that Ms. McAlees would not be able to work for the next three months.[100]  Treating physician Dr. Gokey opined on October 31, 2013 that Ms. McAlees was unable to work and on June 16, 2014 that Ms. McAlees could not work for more than 12 months and required "bedrest with legs elevated."[101]  Dr. Purchiaroni treated Ms. McAlees on a monthly basis from approximately November 2014 through April 2016.  She provided opinions on April 1, 2015, July 23, 2015, and April 11, 2016.  She opined that Ms. McAlees should be on bedrest, walk only out of necessity, and keep her legs elevated at all other times.[102]  Dr. Cranmer examined Ms. McAlees on only one occasion and on the same date, opined that Ms. McAlees could not work and needed to be on bedrest with her legs elevated.[103]  Dr. Jones examined Ms. McAlees and provided an opinion on February 8, 2018 that Ms. McAlees still required bedrest and leg elevation.[104]

Dr. Sklaroff's testimony at the March 9, 2018 hearing contradicted Ms. McAlees's treating and examining physicians' bed rest and leg elevation opinions.  Dr. Sklaroff

---

economy that Ms. McAlees could perform is reserved to the Commissioner and her physicians' opinions that Ms. McAlees could not work are not entitled to deference.  20 C.F.R. § 404.1527(d).  However, the physicians' unanimous opinions that Ms. McAlees required bed rest and leg elevation reflects professional judgment as doctors regarding the severity of Ms. McAlees's impairments and physical restrictions and are entitled to deference.  20 C.F.R.  404.1527(a)(2).

[100] A.R. 352–53.

[101] A.R. 1224–27.

[102] A.R. 580–85, 588, 1220–21.

[103] A.R. 1222–23.

[104] 1217–18.

opined that Ms. McAlees did not require leg elevation as it was "not supported by the medical data and not supported in the medical literature" and was "dwarfed by the use of [compression stockings]."[105] In light of Dr. Sklaroff's contrary opinion, the ALJ was required to provide specific and legitimate reasons for rejecting the medical opinions of Ms. McAlees's treating and examining physicians.[106]

Here, the ALJ found that the unanimous bed rest and leg elevation opinions of Drs. Ryan, Gokey, Purchiaroni, Cranmer, and Jones were "not consistent with the overall objective medical evidence."[107] He noted that at an exam on September 15, 2014, Dr. Purchiaroni found Ms. McAlees had profound lymphedema in the bilateral lower extremities, but that Ms. McAlees was "not in acute distress during the exam, and her lungs were clear to auscultation." He also noted that although Ms. McAlees had been hospitalized three times for cellulitis of her thighs, it had occurred only once since her gastric bypass surgery.[108] However, the Court finds these examples inadequate to show that all five of Ms. McAlees's physicians' opinions regarding leg elevation were not consistent with the overall objective medical evidence.[109] And, Dr. Sklaroff's opinion

---

[105] A.R. 614, 629–53.

[106] *Trevizo v. Berryhill,* 871 F.3d at 676 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (quoting *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005)); *see also Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) ("[T]he reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion.").

[107] A.R. 613–614.

[108] A.R. 614, 1149.

[109] *Trevizo v. Berryhill,* 871 F.3d at 676 ("[T]he ALJ did not consider factors such as the length of the treating relationship, the frequency of examination, the nature and extent of the treatment

alone that Ms. McAlees did not require leg elevation was not substantial evidence to support the rejection her treating physicians' opinions.[110]

First, the record supports the treating physicians' opinions regarding leg elevation. On October 31, 2013, Dr. Gokey noted that Ms. McAlees's cellulitis had not been resolved, that Ms. McAlees was waiting on a bariatric surgery consultation, they were still working on appropriate management of Ms. McAlees's lymphedema, and Ms. McAlees continued to have uncontrolled type 2 diabetes.[111] On June 16, 2014, Dr. Gokey noted that Ms. McAlees was at high risk of repeated episodes of cellulitis and prolonged hospitalizations as a result. She also noted that Ms. McAlees's morbid obesity limited the effectiveness of compression garments.[112] Throughout the record, Dr. Gokey continued to treat Ms. McAlees for cellulitis and lymphedema. She prescribed pain medications for Ms. McAlees's lower extremity pain.[113]

During the time Dr. Purchiaroni treated Ms. McAlees, she was hospitalized from July 12 to July 3, 2015 for cellulitis.[114] In treatment notes, Dr. Purchiaroni observed "[p]rofound lymphedema in [the] bilateral [lower extremities]," massive edema "with

---

relationship, or the supportability of the opinion . . . This failure alone constitutes reversible legal error.") (internal citations omitted).

[110] *Orn v. Astrue,* 495 F.3d 625, 633 (9th Cir. 2007) (A non-examining physician's "opinion does not alone constitute substantial evidence to support the rejection of Orn's treating physicians' opinions.").

[111] A.R. 350–51, 1049–50.

[112] A.R. 1061–65, 1224–25.

[113] *e.g.,* A.R. 1045–50, 1053–56, 1059–65.

[114] A.R. 590–601.

indurated lobes," and "abscesses scattered over the knee area." At these visits, Ms. McAlees also reported significant pain.[115] In April 2016, Dr. Purchiaroni noted that Ms. McAlees's lymphedema had significantly improved after bariatric surgery, but she continued to recommend bed rest and leg elevation and referred Ms. McAlees to a lymphedema specialist "given her complicated lymphedema picture at this juncture."[116]

Although Dr. Jones noted that Ms. McAlees had been hospitalized three times for cellulitis of her thighs, but only once since her gastric bypass surgery, Dr. Jones observed "substantial swelling of the thighs bilaterally" and pain in the right knee upon examination.[117] His treatment notes document that Ms. McAlees was having difficulty finding a plastic surgeon "willing to operate on this patient" for reduction of redundant skin folds after bariatric surgery due to her Medicaid status.[118] Additionally, Ms. McAlees testified that she had tried compression stockings but her thighs were too large due to lymphedema and Medicaid did not cover "designer made stockings." She also testified that elevating her legs for the majority of the day kept pain and swelling down and that she spent about 15 to 18 hours each day elevating her legs.[119]

---

[115] *e.g.,* A.R. 998–99, 1090–94, 1125–26, 1128–29, 1132–33.

[116] A.R. 1137–38, 1220–21.

[117] A.R. 1144–46. On February 8, 2018, Dr. Jones opined that Ms. McAlees was unable to work and continued to require bed rest and leg elevation. A.R. 1217–18.

[118] A.R. 1148–49. *See Orn,* 495 F.3d at 638 (quoting *Gamble v. Chater,* 68 F.3d 319, 321) (9th Cir. 1995) ("disability benefits may not be denied because of the claimant's failure to obtain treatment [she] cannot obtain for lack of funds.").

[119] A.R. 654–59.

For the foregoing reasons, the ALJ did not provide specific and legitimate reasons supported by substantial evidence for rejecting all five of Ms. McAlees's treating and examining physicians' opinions that Ms. McAlees required bed rest and leg elevation for most of the day. The ALJ's decision is reversed for this error.

B.    Scope of Remand

The "ordinary remand rule" applies to disability cases. Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[120] The court follows a three-step analysis to determine whether the case raises the "rare circumstances" that allow a court to exercise its discretion to remand for an award of benefits. "First, [the court] must conclude that 'the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"[121] "Second, [the court] must conclude that 'the record has been fully developed and further administrative proceedings would serve no useful purpose.'"[122] "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate."[123] "Third, [the court] must conclude that 'if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled

---

[120] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

[121] *Brown-Hunter v. Colvin,* 806 F.3d 487, 495 (9th Cir. 2015) (quoting *Garrison*, 759 F.3d at 1020).

[122] *Id.* (quoting *Garrison,* 759 F.3d at 1020).

[123] *Treichler*, 775 F.3d at 1101.

on remand.'"[124]  But, "even if all three requirements are met, [the court] retain[s] 'flexibility' in determining the appropriate remedy" and "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'"[125]

Ms. McAlees argues that this matter should be remanded for payment of an award of benefits.[126]  The Commissioner responds that the Court should affirm, or in the alternative, the Court should remand for further administrative proceedings.[127]

Here, the Court has found that the ALJ did not provide legally sufficient reasons for rejecting the opinions of Drs. Ryan, Gokey, Purchiaroni, Cranmer, and Jones.  Second, the record has been extensively developed regarding Ms. McAlees's cellulitis, lymphedema, and obesity.  It contains hospitalization records, treatment notes, medical evaluations, and health status reports.  It includes testimony and a function report from Ms. McAlees, which also corroborate her impairments.  Moreover, the VE specifically opined that an individual that needed to have legs elevated most of the day could not sustain work.  Therefore, if Ms. McAlees's treating and examining physicians' bed rest and leg elevation opinions are credited as true, the ALJ would have been required to find Ms. McAlees disabled.

---

[124]  *Brown-Hunter,* 806 F.3d at 495 (quoting *Garrison,* 759 F.3d at 1021).

[125]  *Id.* (quoting *Garrison*, 759 F.3d at 1021).

[126]  Docket 15 at 14–18.

[127]  Docket 16 at 9–10.

The Court concludes that all three conditions to credit-as-true have been satisfied and remand for the calculation and award of benefits is warranted in this case.[128]  Further, the "rare circumstances" in this case weigh heavily in favor of the immediate payment of benefits.  Ms. McAlees's alleged disability more than six years ago.  This matter has been before this Court twice and Ms. McAlees has appeared at hearings before the ALJ on at least four occasions.  She has extensive medical needs and has frequently lacked medical approvals from Medicaid for necessary treatment.  She has been unable to find a plastic surgeon willing to perform surgery for redundant skin following bariatric surgery and subsequent weight loss.  "Further delays at this point would be unduly burdensome."[129]  Therefore, the case will be remanded to the ALJ for the calculation and award of benefits.

## V.   ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error.  Accordingly, IT IS ORDERED that Ms. McAlees's request for relief at Docket 15 is **GRANTED** as set forth herein, the Commissioner's final decision is **VACATED,** and the case is **REMANDED** for the calculation and award of benefits.

---

[128] The Ninth Circuit has clarified that courts will "remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison v. Colvin,* 759 F.3d 995, 1021 (9th Cir. 2014); *Burrell v. Colvin,* 775 F.3d 1133, 1141 (9th Cir. 2014).

[129] *Trevizo,* 871 F.3d at 683 (quoting *Terry v. Sullivan,* 903 F.2d 1273, 1280 (9th Cir. 1990).

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 21st day of October, 2019 at Anchorage, Alaska.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE